# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 19-1103V
UNPUBLISHED

---

BRIDGET MORRISON-
LANGEHOUGH,

                Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

                Respondent.

Chief Special Master Corcoran

Filed: April 14, 2022

Special Processing Unit (SPU);
Entitlement to Compensation; Table
Injury; Decision Awarding Damages;
Pain and Suffering; Influenza (Flu)
Vaccine; Shoulder Injury Related to
Vaccine Administration (SIRVA)

---

*David John Carney, Green & Schafle, LLC, Philadelphia, PA,* for Petitioner.

*Althea Walker Davis, U.S. Department of Justice, Washington, DC,* for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On July 30, 2019, Bridget Morrison-Langehough filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a Shoulder Injury Related to Vaccine Administration ("SIRVA") as a result of an influenza ("flu") vaccine administered to her on October 15, 2018. Petition, ECF No. 1 at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

Petitioner has filed a Motion for a Ruling on the Record coupled with a Brief in Support of Damages. For the reasons described below, I find that Petitioner is entitled to

---

[1] Although I have not formally designated this Decision for publication, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002, because it contains a reasoned explanation for my determination. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

compensation, and I award damages in the amount **$70,000.00**, **representing Petitioner's actual pain and suffering.**

## I.      Relevant Procedural History

As noted above, the case was initiated in July 2019. On November 13, 2020, Respondent filed a status report stating that he was willing to entertain settlement discussions. ECF No. 27. Thereafter, the parties attempted to informally resolve the issue of damages, but reached an impasse on an appropriate award. ECF No. 33.

Respondent filed his Rule 4(c) Report on March 29, 2021, disputing Petitioner's entitlement to a Vaccine Program award. ECF No. 34. Because Petitioner had not alleged that she suffered a Table injury, Respondent argued that "Petitioner's records do not support a finding that her flu vaccine in fact caused her alleged injury." *Id.* at 8. Shortly thereafter, on April 12, 2021, Petitioner filed her amended petition specifically asserting a SIRVA Table injury as a result of her October 2018 vaccination. ECF No. 36. Then, on May 13, 2021, Respondent filed an Amended Rule 4(c) Report arguing that the evidence preponderated against a finding that the onset of Petitioner's shoulder pain occurred within 48 hours of her vaccination (a core SIRVA Table requirement). ECF No. 40.

On June 15, 2021, Petitioner filed a Motion for Ruling on Record and Brief in support of Damages ("Motion"), arguing that she had established entitlement to compensation for her SIRVA injury, and also requesting $85,000.00 for past/actual pain and suffering. ECF No. 42. Petitioner specifically asserted that evidence in the record preponderantly established that the vaccine caused injury within 48 hours. *Id.*

Respondent filed his Response to Petitioner's Motion on July 15, 2021 ("Response") recommending that entitlement to compensation be denied under the terms of the Vaccine Act. ECF No. 43. Respondent maintained that Petitioner's contemporaneous medical records do not support a finding that the onset of Petitioner's pain occurred within 48 hours of vaccination. *Id.* Respondent also argues for only $50,000.00 in actual pain and suffering (assuming entitlement is found). Response at 12. Petitioner filed her Reply and additional medical records on July 22, 2021. ECF Nos. 44, 45

## II.      Factual Findings and Ruling on Entitlement

### A.  Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section

11(c)(1), including the factual circumstances surrounding his claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Human Servs.,* 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.

---

[3] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## B. Factual Findings Regarding Onset of Pain

Based upon a review of the entire record, I find that the onset of Petitioner's pain occurred within 48 hours. Specifically, I highlight the following:

- Petitioner was administered a flu shot on October 15, 2018. Ex. 1; Ex. 8. The shot was administered into Petitioner's left deltoid. *Id.*

- In her affidavit, Petitioner avers that "there was a very unusual sound when the needle [used to administer Petitioner's October 15, 2018 flu shot] penetrated my skin, causing an immediate and severe pain in my shoulder." Ex. 2 at 2.

- Petitioner reported to her dermatologist on October 23, 2018, for an evaluation of skin lesions on her forehead and left leg. Ex. 3 at 65-67. The medical record documenting this visit does not indicate that Petitioner complained of left shoulder or arm pain.

- On November 13, 2018 (29 days post vaccination), Petitioner presented to Dr. Richard Morrison, her primary care physician, with complaints of shoulder pain and reduced range of motion. Ex. 3 at 60. Dr. Morrison's handwritten note does not indicate whether Petitioner's left shoulder or arm were examined during this visit. *Id.* However, Dr. Morrison referred Petitioner for an x-ray of her cervical spine and diagnosed her with "cervical root syndrome" and arm pain. *Id.*

- During a December 26, 2018 cardiology appointment, Petitioner reported left shoulder pain. Noting that Petitioner had "chronic left shoulder discomfort which . . . may be a significant rotator cuff and joint problem," the treating physician referred her to an orthopedist.  Ex. 3 at 75-77.

- Petitioner presented to Physician Assistant ("P.A.") Jessica Miller at the University of Vermont Medical Center ("UVMC") on February 4, 2019 concerning "chronic left shoulder pain ongoing since October 15th." Ex. 4 at 9. P.A. Miller noted that Petitioner's "left shoulder and arm pain started suddenly during and after a flu shot." *Id.* Although Petitioner reported "constant pain, waxing and waning" and a worsening of symptoms when lifting her arm, she continued to participate in Taekwondo three-to-four days per week with modification. *Id.*

- During her February 4, 2019 appointment, Petitioner was found to have "tenderness mid brachium extending to the lateral shoulder. Diffuse tenderness AC joint, long head bicep tendon and pectoralis. She has 70 degrees of left active abduction and forward flexion." Ex. 4 at 10. Moreover, x-rays of Petitioner's left shoulder revealed mild degenerative changes in the glenohumeral joint and moderate AC joint osteoarthritis. *Id.* at 11. Petitioner was assessed with chronic left shoulder pain "of unclear etiology." *Id.*

- Between February 19 and September 5, 2019, Petitioner participated in ten sessions of physical therapy. Ex. 4 at 23 - 28; Ex. 5 at 7 - 16, 29 - 31, 36 - 38, 53 - 54, 69 - 70; Ex. 9 at 8 - 10, 40 - 43. During the initial evaluation, Petitioner indicated that, at present, her pain was a three on a ten-point pain scale. *Id.* at 23. She further indicated that her pain ranged from a three to a ten on the same scale. *Id.* This pain was described as a constant ache with frequent stabbing, burning, tingling, and "electric shock-like sensations that travel from the back of her shoulder into her left hand." *Id.* at 23-24. Petitioner further noted feeling weak due to the pain and being awakened by her symptoms on most nights. *Id.* at 24. The physical therapist indicated that Petitioner's left shoulder symptoms were consistent with cervical radiculopathy. *Id.* at 27.

- At Petitioner's March 7, 2019 physical therapy session, Petitioner reported that her shoulder had been painful over the previous weekend and stated that she was unable to get into a position that didn't hurt. Ex. 5 at 7. During Petitioner's March 18, 2019 session, her physical therapist noted that Petitioner's progress was slow, that her nighttime pain was worse, and that "[o]ne source of pain appears to be her RCT and subacromial bursae." *Id.* at 15.

- Petitioner underwent an MRI of her left shoulder on March 19, 2019. Ex. 4 at 72-73. It revealed moderate tendinosis of the supraspinatus, infraspinatus, and subscapularis tendons; moderate tendinosis and synovitis of the long head of biceps tendon; chondral fissuring over the superior and inferomedial humeral head; circumferential degenerative tearing of the labrum; mild AC joint degenerative changes; possible loose body and synovitis within the axillary recess; and a moderate volume of subacromial bursal fluid. *Id.* at 72-73.

- On March 22, 2019, Petitioner returned to P.A. Miller concerning "continued left shoulder pain starting October 15th after a flu injection." Ex. 5 at 21. Petitioner reported that although physical therapy helped to alleviate pain and increase her range of motion, she continued to have soreness and "sharp pain" with quick movements. *Id.* Petitioner further reported "pain in multiple areas around the shoulder as well as traveling down the arm to her elbow, sometimes to [the] wrist." *Id.* P.A. Miller noted that Petitioner's MRI results were "consistent with an adhesive capsulitis type of picture." *Id.* at 23.

- Petitioner's March 26, 2019 physical therapy note indicates that Petitioner's shoulder pain became aggravated after she fell ill with the flu. Ex. 5 at 29. Petitioner questioned whether the pain would ever subside enough to permit a full night's rest. *Id.*

- The note documenting Petitioner's April 1, 2019 physical therapy session indicates that her "intense pain and inflammation [are] intermittent and impede[] her ability to fully participate with her [home exercise program]." Ex. 5 at 37.

- On April 9, 2019, Petitioner presented to P.A. Miller for an ultrasound guided injection into her left shoulder. Ex. 5 at 45. Due to Petitioner's allergy to Novocain, it was administered without anesthetic. *Id.* at 46. In addition to noting that Petitioner rated her left shoulder pain as a four on a ten-point scale, the medical note documenting this appointment indicates that Petitioner was diagnosed with left shoulder adhesive capsulitis. *Id.*

- Progress notes documenting Petitioner's May 2, 2019 physical therapy appointment indicate that the glenohumeral joint injection "provided minimal relief after 4-5 days but did not have lasting effects." Ex. 5 at 55. Petitioner's immediate reaction to the injection involved swelling, redness and pain. *Id.* Petitioner rated her pain as a three out of a ten on a ten-point scale and described it as "something stuck, sharp and shooting." *Id.* at 53.

- During a June 11, 2019 appointment at UVMC, Petitioner reported ongoing pain in two different locations including the anterior shoulder extending over to the bicep as well as the lateral deltoid. Ex. 5 at 61. Petitioner rated her pain as a four on a ten-point scale. *Id.*

- At Petitioner's eighth physical therapy session on June 12, 2019 (approximately eight months post-vaccination), Petitioner reported that she was trying to add swimming to her activities. Ex. 5 at 69. In addition to "walk[ing] 5 dogs," Petitioner's activities

included biking (resulting in soreness), gardening, moving, "working outside," and taking care of her grandchild despite noting that it was "[h]ard to lift her." *Id.*

- The encounter note documenting Petitioner's July 11, 2019 physical therapy session reflects that despite being "very active," Petitioner was "very much in pain." Ex. 9 at 8. Petitioner explained that she "[d]id not sleep at all the last night. Some days the [range of motion] is good, other days it is really limited." *Id.* She rated her current pain as a six on a ten-point scale. *Id.*

- On July 25, 2019, Petitioner presented to Drs. Brandon Lentine and James Slaughterbeck concerning her ongoing shoulder pain. Ex. 9 at 16. It was noted that Petitioner "thinks that all of [her] pain began after a flu shot in her deltoid" and that "[t]oday, her pain is worse in the anterior shoulder." *Id.* Petitioner was assessed with improving frozen shoulder and biceps tendinitis. *Id.* at 17. Per Drs. Lentine and Slaughterbeck's recommendation, Petitioner underwent EMG/NCV testing. *Id.* at 17. The results were normal. *Id.* at 25-28.

- The medical note documenting Petitioner's August 20, 2019 follow up appointment with Dr. Slaughterbeck indicates that she was "making good progress with physical therapy" and that her range of motion appeared to be improving. Ex. 9 at 34.

- Petitioner's September 5, 2019 physical therapy discharge note indicates that she was participating in Taekwondo four days a week, swimming "a lot," and walking at night. Ex. 9 at 40. It was further noted that Petitioner's range of motion and strength had improved and that her "goals [were] mostly achieved." *Id.* at 42. Petitioner requested "progression of her home program and discharge from this episode of care" and indicated that her pain now ranged from a two to a six on a ten-point pain scale. *Id.* at 40, 42.

- Petitioner returned to physical therapy on October 8, 2019 and on January 7, 2020 concerning her knee. Ex. 13 at 31-36, 38-40. She explained to her physical therapist that her shoulder problem had previously taken priority, but "now I am ready for help with my knees." *Id.* at 32.

- In her affidavit, signed on July 19, 2019, Petitioner stated that she continued to experience "severe, excruciating and daily pain in my left shoulder when performing certain basic and daily functions." Ex. 2 at 6. In addition to noting that she still suffered from limited range of motion, Petitioner also stated that she was unable to lift her left arm above her head, and that lingering shoulder pain has had a negative impact on sleep. *Id.* Further, Petitioner averred that due to her inability to make right turns while driving, she frequently relied on her husband to transport her children. *Id.* at 5.

- After a seven-month gap in treatment for her shoulder and approximately a year and a half post-vaccination, Petitioner underwent a video physical therapy evaluation on April 21, 2020. Ex. 12 at 1-5. In addition to noting posterior neck pain, Petitioner reported that her left shoulder pain had returned and was currently a five on a ten-point pain scale. *Id.* The physical therapist opined that Petitioner's symptoms were

consistent with left shoulder impingement and cervicalgia and that "the daily stresses and strains of computer work, walking the dogs on a leash and some painting projects at home have irritated her soft tissues." *Id.* at 4. It was further noted that Petitioner's impairments included "limited motion in her neck and left shoulder and muscle spasms." *Id.* Petitioner was found to have difficulty sleeping, reaching, pushing, and pulling. *Id.* at 4. The therapist recommended that Petitioner participate in an additional six weeks of therapy. *Id.* at 5.

- Petitioner returned to physical therapy on January 26, 2021. During this visit, Petitioner stated that she had been "managing pretty well until [three] weeks ago" when she fell onto her left elbow. Ex. 14 at 25. The location of Petitioner's pain was noted as "[e]lbow (and shoulder left)." *Id.* Petitioner was assessed with chronic left shoulder pain and "signs consistent with [rotator cuff] [t]endonosis, left upper trap spasm and neck stiffness." *Id.* at 28. Her treatment plan included physical therapy once per week for twelve weeks. *Id.*

- Over three months later, on May 12, 2021, Petitioner presented to UVMC with "5% left-sided neck pain 95% left extremity weakness." Ex. 14 at 37. Petitioner was also found to have "shooting pain with paresthesia about the lateral shoulder, posterior elbow, dorsal forearm and the thumb" with symptoms beginning in 2018. *Id.* She rated her pain as a five on a ten-point pain scale. *Id.* After x-rays were taken and reviewed, Petitioner was assessed with "chronic atraumatic left shoulder pain with some loss of internal rotation. Symptoms likely secondary to degenerative rotator cuff tendinopathy/labral tear in the setting of glenohumeral joint arthritis." *Id.* at 39.

- Petitioner underwent an MRI of her left shoulder on June 11, 2021 due to "neck pain that travels into the left shoulder for months." Ex. 14 at 49. Findings included trace subacromial-subdeltoid bursal fluid and "degenerative free edge fraying of the posterior superior labrum." *Id.* A "[r]elatively broad area of chondral thinning at the superomedial humeral head most pronounced posteriorly with chondral degeneration at the inferomedial humeral head" was also noted. *Id.*

The above items of evidence collectively establish that Petitioner's shoulder pain most likely began within 48 hours of receiving the October 15, 2018 flu vaccine. Petitioner's medical records sometimes fail to reflect a precise date of onset, and include vague references to the start of Petitioner's pain (i.e., "*after* receiving a flu shot . . ."). However, there are also instances where the onset of Petitioner's symptoms are assigned to a specific date. *See*, *e,g.*, Ex. 4 at 9 (February 9, 2019 medical note documenting Petitioner's left shoulder pain as "ongoing since October 15th˚); Ex. 5 at 21 (March 22, 2019 progress note stating that Petitioner presented for "left shoulder pain starting October 15th after a flu injection."). Moreover, there is no counterevidence *undercutting* Petitioner's contention that her pain began close-in-time to vaccination or suggesting an onset out of the two-day window set by the Table, and she consistently attributed her shoulder symptoms to her flu shot.

Admittedly, there is evidence of an intervening medical appointment, close in time to vaccination, that does not mention the injury, but I do not find that it rebuts the evidence supporting Table onset. Petitioner had one intervening appointment on October 23, 2018 – eight days post vaccination – with her dermatologist concerning skin lesions. Ex. 3 at 65-67. Petitioner asserts that her shoulder pain went unmentioned during this appointment because "there would have been no reason . . . to believe that [a] dermatologist would be able to treat [my] orthopedic injury." Reply at 2. Respondent argues that, in light of Petitioner's report of shoulder pain to her cardiologist - "another treating physician in an unrelated specialty" - her failure to also raise this issue with her dermatologist merits suspicion. Response at 9-10. However, as noted by Petitioner, her complaint to her cardiologist arose only *after* Petitioner's attempts to self-treat had failed, and after she reported her shoulder pain to her primary care physician. Reply at 3. Hence, the fact that a report was made to one kind of non-specialist does not, given the circumstances, mean Petitioner should have done so earlier to a different kind of non-orthopedic specialist,

I also note that a single intervening medical encounter with a physician in an unrelated specialty is not enough to disprove onset, especially given the overwhelmingly consistent assertions at all subsequent medical encounters. As is often noted in SIRVA cases, injured individuals often misapprehend the degree of harm they have experienced, expecting it to be part of general post-vaccination malaise that will diminish with time. Furthermore, the affidavit submitted by Petitioner is consistent with the medical evidence, and I have found no reason not to deem it credible otherwise.

Lastly, I do not conclude that a temporal delay of 29 days before seeking treatment specifically for the SIRVA injury undermines Petitioner's onset assertions. Indeed, this is a much shorter delay than what is commonly seen in other SIRVA cases, in which injured parties reasonably delay treatment based on the assumption that their pain is likely transitory. *See, e.g., Tenneson v. Sec'y of Health & Human Servs*., No. 16-1664V, 2018 WL 3083140, at *5 (Fed. Cl. Spec. Mstr. Mar. 30, 2018), *mot. for review denied,* 142 Fed. Cl. 329 (2019), (finding a 48-hour onset of shoulder pain despite a nearly six-month delay in seeking treatment); *Williams v. Sec'y of Health & Human Servs*., 17-830V, 2019 WL 1040410, at *9 (Fed. Cl. Spec. Mstr. Jan. 31, 2019) (noting a delay in seeking treatment for five-and-a-half months because petitioner underestimated the severity of her shoulder injury); *Knauss v. Sec'y of Health & Human Servs*., 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (noting a three-month delay in seeking treatment). While delays in treatment reasonably impact the damages to be awarded (since they suggest a less-severe injury that the petitioner could tolerate), they do not *per se* undermine an onset finding consistent with the Table requirements.

Accordingly, I find there is preponderant evidence to establish that the onset of Petitioner's left shoulder pain occurred within 48 hours of the October 15, 2018 flu vaccination.

### C. Requirements for a Table SIRVA

After a review of the entire record, I find that Petitioner has preponderantly satisfied the QAI requirements for a Table SIRVA, in addition to onset. The medical records and affidavit filed in this case are hereby incorporated by reference.

#### 1. Prior Condition

The first QAI requirement for a Table SIRVA is lack of a history revealing problems associated with the affected shoulder which were experienced prior to vaccination and would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i).

Respondent has not contested that Petitioner has met the first requirement under the QAI for a Table SIRVA. Additionally, I do not find any evidence that Petitioner suffered a pre-vaccination history of problems that would explain her post-vaccination shoulder symptoms. Accordingly, I find that Petitioner has met this first criterion to establish a Table SIRVA.

#### 2. Scope of Pain and Limited ROM

To establish a Table SIRVA, Petitioner's pain and reduced range of motion must be limited to the shoulder in which the vaccination was administered. 42 C.F.R. § 100.3(c)(10)(iii). Respondent has not contested that Petitioner meets this criterion.

Medical records documenting Petitioner's treatment prior to April 2020 include a reference to "electric shock-like sensations that travel from the back of [Petitioner's] shoulder into her left hand," and pain that traveled down to Petitioner's elbow and wrist. Ex. 4 at 24, Ex. 5 at 21. However, the majority of Petitioner's records between the fall of 2018 and the spring of 2020 support the finding that her pain and limited range of motion were limited to her left shoulder.

Approximately seven months after Petitioner's successful discharge from physical therapy, on April 21, 2020, she reported a resurgence of left shoulder pain as well as muscle spasms and limited range of motion in her neck. Ex. 12 at 1, 4. However, these symptoms were attributed to cervicalgia, on one hand, and left shoulder impingement, on the other. *Id.* at 4. Additionally, I note that (based on my experience adjudicating SIRVA cases) it is not uncommon for petitioners who suffer SIRVA to later develop collateral pain

in other locations of their upper extremity (although whether those sequelae are products of a SIRVA or not will depend on the facts of the case).

Lastly, although Petitioner complained of elbow pain in January 2021, it is evident that this was a separate injury. *See* Ex. 14 at 25 (noting that Petitioner lost her balance and struck her elbow on furniture).

Therefore, based on the record as a whole, I find that Petitioner has demonstrated by a preponderance of the evidence that her pain and reduced range of motion were limited to the shoulder in which the intramuscular vaccine was administered.

### 3. Other Condition or Abnormality

The last QAI criteria for a Table SIRVA states that there must be no other condition or abnormality which would explain a petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Respondent has not contested that Petitioner meets this criterion, and there is no evidence in the record to the contrary. Thus, the record contains preponderant evidence establishing that there is no other condition or abnormality which would explain the symptoms of Petitioner's right shoulder injury.

### D. Other Requirements for Entitlement

Even if a petitioner has satisfied the requirements of a Table injury or established causation-in-fact, he or she must also provide preponderant evidence of the additional requirements of Section 11(c), i.e., receipt of a covered vaccine, residual effects of injury lasting six months, etc. *See generally* § 11(c)(1)(A)(B)(D)(E). But those elements are established or undisputed.

Thus, based upon all of the above, Petitioner has established that she suffered a Table SIRVA, satisfying all other requirements for compensation.

### III. Damages

### A. The Parties' Arguments

Petitioner requests $85,000.00 in actual pain and suffering. Motion at 1. She asserts that her course of treatment (including one x-ray, one MRI, one cortisone injection, EMG/NCV testing, and ten sessions of physical therapy) warrants an award at that level. Motion at 18-29. Petitioner also emphasizes that she endured severe pain and suffering, and that her symptoms continue to interfere with her ability to perform recreational activities as well as activities of daily living. Motion at 21; Reply at 10. To support the amount requested for her pain and suffering, Petitioner compared the

circumstances in her case to those in four other published Program decisions that resulted in pain and suffering awards of $80,000.00 or more: *Kent*, *Weber*, *Young* and *Dhanoa*.[4]

Respondent, by contrast, proposes an award of no more than $50,000.00 for Petitioner's pain and suffering. Response at 12. He argues that "unlike the petitioners in the cases referenced in her brief, petitioner's [physical therapy] was much more limited, and she was able to continue with Tae Kwon Do . . . and work outside." Response at 23-24. Respondent also argues that, "by less than a year after vaccination, [P]etitioner was able to do a significant amount of swimming." *Id.* at 24. Respondent cites to *Rayborn v. Sec'y of Health & Human Servs.*, No. 18-0226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020), in which petitioner was awarded $55,000.00 for actual pain and suffering. *Id.*

### B. Legal Standards for Damages Awards

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Sections II and III of *Berge v. Sec'y Health & Human Servs.*, No. 19-1474V, 2021 WL 4144999, at *1-3. (Fed. Cl. Spec. Mstr. Aug. 17, 2021).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. [5]

---

[4] *Kent v. Sec'y of Health & Human Servs.*, No.17-0073V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019)(awarding $80,000.00 for actual pain and suffering); *Weber v. Sec'y of Health & Human Servs.*, No. 17-0399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. Apr. 9, 2019) (awarding $85,000.00 for past pain and suffering); *Young v. Sec'y of Health & Human Servs.*, No. 15-1241V, 2019 WL 396981 (Fed. Cl. Spec. Mstr. Jan. 4, 2019) (awarding $100,000.00 for past pain and suffering); *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering.)

[5] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

### C.  Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the same record relied upon to determine entitlement, including the filed affidavit, medical records, and written briefs. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and rely upon my experience adjudicating these cases.[6]

The case record overall establishes that Petitioner experienced a moderate shoulder injury that involved only relatively conservative (yet frequent) treatment for approximately eleven months. Between October 15, 2018, and September 5, 2019, Petitioner participated in ten physical therapy sessions and underwent an MRI, EMG/NCV testing, and an x-ray. Ex. 4 at 11, 23-28, 72-73; Ex. 5 at 7-70; Ex. 9 at 4-10, 25-28, 40-43. Petitioner also received a steroid injection which resulted in swelling, redness, and pain at the injection site. Ex. 5 at 55.

Despite the initially-consistent treatment history, Petitioner did not obtain care for her injury until approximately one month after her October 2018 flu shot. Ex. 3 at 60. Moreover, while Petitioner described her pain as a constant ache with frequent stabbing, burning and tingling sensations on February 19, 2019, on February 4, 2019 – only around two weeks earlier – Petitioner informed her P.A. that she continued to participate in Taekwondo multiple days a week, albeit with limitations. Ex. 4 at 9, 23-24. And, by June 12, 2019 (approximately eight months post-vaccination), Petitioner reported that she was "[t]rying to add swimming to [her] activities. Gardening and mowing and working outside." Ex. 5 at 69. Petitioner also "walk[ed] 5 dogs" and took care of her grandchild for half of the week despite having difficulty lifting her. *Id.*

Additionally, Petitioner's records suggest that physical therapy was successful at first. At discharge (approximately eleven months post-vaccination), it was noted that Petitioner's goals "were mostly achieved," and that both her range of motion and strength had improved. Ex. 9 at 40. Petitioner's participation in Taekwondo and swimming was again noted. *Id.* at 42.

However, on April 21, 2020 – about seven months after Petitioner's discharge from physical therapy, Petitioner reported a return of shoulder pain. Ex. 12 at 1. She also noted

---

[6] My summary of facts, as set forth in Section II(B) herein, is fully incorporated and relied upon in my decision awarding damages.

limited range of motion in her neck as well as muscle spasms. *Id.* at 4. Collectively, these symptoms were attributed to an irritation of Petitioner's soft tissues brought about by "daily stresses and strains," including office work, dog-walking and home improvement projects *Id.* Although additional physical therapy was recommended, Petitioner did not return for treatment until nine months later, on January 26, 2021, after injuring her elbow. Ex. 14 at 25-28. The record documenting this appointment reflects that Petitioner also presented with "chronic left shoulder pain and signs consistent with RC [t]endonosis, left upper trap spasm and neck spasm." *Id.* at 28.

Finally, in the spring of 2021, Petitioner sought treatment for "shooting pain with paresthesia about the lateral shoulder, posterior elbow, dorsal forearm and thumb" with symptoms beginning in 2018. Ex. 14 at 37. She underwent an additional MRI for "neck pain that travels into the left shoulder for months" on June 11, 2021. *Id.* at 49.

Although Petitioner's shoulder symptoms returned after a seven-month abatement, the medical records support a finding that the majority of Petitioner's active treatment as well as her most severe pain occurred within the first eleven months. Moreover, the treatment she received after September 5, 2019, was comparatively minimal (two sessions of physical therapy, one orthopedic visit and an MRI) with significant gaps between visits to medical providers. Treatment gaps are a relevant consideration in determining the degree of Petitioner's pain and suffering. *Dirksen v. Sec'y of Health & Human Servs.*, No. 16-1461V, 2018 WL 6293201, at *9-10 (Fed. Cl. Spec. Mstr. Oct. 18, 2018).

Based upon all of the above, Petitioner has demonstrated entitlement to an award for pain and suffering exceeding what has been recommended by Respondent. While I agree that *Rayborn* represents a reasonable comparable, I find the facts of Petitioner's case to be more severe. In particular, I note that petitioner in *Rayborn* did not seek treatment for her injury until approximately four months after vaccination. Additionally, the duration of Petitioner's injury and treatment course exceeds what the *Rayborn* petitioner experienced (only nine months). *Id.*

However, the $85,000.00 sum requested by Petitioner is nevertheless a bit high given the facts. Petitioner maintains that this case is comparable to cases awarding between $80,000.00 and $100,000.00. However, I consider these cases to have involved aggravating circumstances (such as a limitation of treatment options due to pregnancy), or greater severity and/or duration than in this case.

In sum, when balancing the length of Petitioner's moderate SIRVA injury with the reported severity of her pain and several treatment gaps, I find that $70,000.00 in total compensation for actual pain and suffering is reasonable in this case.

## IV.     Conclusion

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $70,000.00, representing compensation for actual pain and suffering.**

This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[7]

**IT IS SO ORDERED.**

**<u>s/Brian H. Corcoran</u>**
Brian H. Corcoran
Chief Special Master

---

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.